JohNson, Chief Judge,
delivered the opinion of the court:
This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner’s rejection of claims 25, 27, 28, 33 and 35 of appellants’ application No. 91,186 filed May 3, 1949, for “Synthesis of Organic Compounds.” The rejection was twofold: unpatent-ability over the prior art, and double patenting.
Claim 25 is representative of the appealed claims and reads as follows:
A method for reducing an iron oxide which comprises suspending a quantity of finely divided iron oxide in an upwardly flowing reducing gas consisting of hydrogen in a pseudo-liquid dense phase condition at a temperature and for a sufficient length of time of at least 5 hours to cause substantial reduction of iron oxide to elementary iron and maintaining the temperature of contact between reducing gas and finely divided iron oxide above about 550° F. but not substantially higher than 950° F. at substantially all times.
Appellants’ alleged invention relates to a method of reducing iron oxide either completely or partially to elemental iron by means of a fluidized bed process. Iron oxide to be treated is ground into finely divided form and charged into a reactor. A heated reducing gas, consisting essentially of hydrogen, is blown up into the reactor at a velocity great enough to suspend the finely divided particles in the reactor and to cause them to assume a condition which may be described as “pseudo-liquid,” since the mass exhibits many of the properties of a true liquid, particularly as to flowability and density. The heating temperatures employed vary, depending upon the alkali content of the oxide, the application as filed indicating that under no circumstances may the temperature exceed 1050° F. As originally *987 ■filed, the application indicated that either of two fluidized processes «could be employed to produce the desired result, one wherein the finely divided oxide particles are in a “pseudo-liquid dense phase” •condition and the other in which they are in a highly dispersed condition. In the former, there is no net movement of the particles in the reactor, the gas being injected at a velocity only sufficient to suspend them therein. In the latter, the reducing gas is injected at a sufficiently high velocity so that the particles continuously move in the •direction of flow of the gases out through the top of the reactor, said particles eventually being recycled to the reactor.
The references relied upon are:[1]
Lewis, 2,343,780, March 7,1944.
McGrath et al., 2,671,765, March 9,1954.
The Lewis patent refers to a method of recovery of elemental metals from their ores, such as iron from iron ore. In essence, the method in-wolves the suspension of the powdered ore in a flowing stream of reducing gas rich in free hydrogen “in such a way that the mixture presents the appearance of a boiling liquid.” The patentee alternately refers to the condition of the mixture as a “substantially uniform dispersion” and a “fairly dense suspension.” The reducing temperature is disclosed as “in the neighborhood of 700° C., and in any event below that temperature at which iron assumes a plastic state.” The minimum temperature is disclosed as “that necessary to support the reaction between hydrogen and iron oxide.” The embodiment disclosed by Lewis is apparently similar to the second embodiment of appellants in that the ore moves slowly along with the gas and out of the reactor, it eventually being recycled to said reactor.
The McGrath et al. patent is appellants’ own, and was applied .against all the claims on appeal in the board’s double patenting rejection. In view we take of the case, however, it will be unnecessary to discuss either the McGrath ét al. patent or the board’s double patenting rejection.
The board was of the opinion that Lewis discloses substantially "the same process as that claimed by appellants and that the only limitations in the claims which are not substantially anticipated by Lewis are those directed to the reduction time and temperature. It regarded the former as a matter within the ken of a skilled artisan. As to the temperature limitations in the claims, the board stated:
* * * if it is found that when the reduction temperature is raised to 1300° F.[2] ithe charge becomes defluidized, it involves no invention to carry out the reduction at the lower temperature. This is particularly true in view of the fact *988 that while Lewis indicated that a temperature “in the neighborhood oí 700° C.” may be used, he stated that in any event the temperature should be “below the temperature at which iron assumes a plastic state.” We are of the opinion that this statement constitutes ample indication to a metallurgist that the temperature should not be raised to a point at which the iron becomes sintered and agglomerated because this condition arises only after the iron is heated to a sufficient degree to become somewhat fused at the surface and is, therefore, in the plastic state at least at its surface. * * *
The board found no patentable significance in the other limitations of the appealed claims.
Appellants’ arguments will be set forth as each claim on appeal is discussed.
With respect to claim 25, appellants argue that the following limitations are not shown by Lewis:
(1) A reducing gas consisting of hydrogen (they claim Lewis discloses a mixture of hydrogen and air);
(2) A minimum contact time of 5 hours (they claim that Lewis says nothing about minimum contact time) ;
(3) A minimum temperature of about 550° F.;
(4) The maintenance of a “pseudo-liquid dense phase” condition (they claim that Lewis discloses a dispersed system only); and
(5) A maximum temperature of 950° F. (they claim that Lewis discloses a temperature of 700° C. [or about 1,300° F.] or, in any event, a temperature below the melting point of iron).
As to the first, second and third contentions, little need be said. Both appellants and Lewis use hydrogen gas to reduce the iron oxide and the fact that Lewis suggests adding a small amount of air to cause combustion of the hydrogen to maintain the desired temperature does not render appellants’ reducing gas patentably different from Lewis’. Appellants themselves suggest mixing other gases, such as methane and recycle gas, with their hydrogen. The selection of minimum temperature and contact time is clearly within the purview of the skilled artisan. Lewis heats his oxide “for a sufficient period of time” to completely reduce it and sets a minimum temperature at “that necessary to support the reaction between hydrogen and iron oxide.”
As to the fourth contention, even if we were to assume that a “pseudo-liquid dense phase” condition included only a system wherein there was no net movement of the particles, this limitation alone is not sufficient to patentably define over Lewis. True, as appellants point out, Lewis discloses a circulating system (the same system originally disclosed by appellants as an alternative system, but which has since been canceled from their specification) and it also might be argued that Lewis’ particles are dispersed whereas appellants’ are in a dense phase condition. These differences alone, however, mean little as far as the appealed claims are concerned. Both systems are recognized as *989 “fluidized” in the art; in both the particles assume a pseudo-liquid state and the system resembles a boiling liquid. Appellants have pointed to no difference between the two systems upon which patent-ability can be predicated. Indeed, Lewis refers to his system as “fairly dense,” which would seem to bring the two systems closer together. The fact that in one system there is net movement of the particles, whereas in the other, there is no net movement also means little as far as this case is concerned.
The gravamen of the case, however, resides in the argument found in appellants’ fifth point of difference. Appellants urge that there is a critical maximum temperature above which their system becomes defluidized; that this temperature is 950° F. with iron oxide containing less than 0.8 weight per cent alkali and 850° F. with iron oxide containing more than 0.8 per cent alkali; and that Lewis suggests a temperature in the neighborhod of 700° C. (approximately 1300° F.) or in any event “below that temperature at which iron assumes a plastic state.” Appellants point to Lewis’ alternative use of the terms “plastic state” and “melting point” in his claims and urge that this indicates that Lewis was really concerned with the melting'point of iron, which is above 2000° F., when he spoke of “plastic state.” Appellants have introduced into the record two affidavits which describe test reduction runs on iron oxide and which state that 950° F. is a maximum critical temperature beyond which defluidization takes place.
We are of the opinion that, notwithstanding appellants’ arguments to the contrary, claim 25 was properly rejected by the board over Lewis. For purposes of this case we will accept as true appellants’ contentions that 950° F. is a critical temperature above which their process will not work due to defluidization. We feel, however, that appellants’ solution to the defluidization problem is either suggested by Lewis or, at the least, would be obvious to the skilled artisan based upon the Lewis disclosure. It is true, as appellants argue, that Lewis’ reference to the “plastic temperature” of iron is not entirely clear, since Lewis uses that term and the phrase “melting point” interchangeably. It is difficult to understand, however, how anyone skilled in the art could possibly conclude that what Lewis is referring to is the point at which iron actually melts (which is in excess of 2000° F.); it would seem more reasonable, in the context of things, to conclude that Lewis was referring to the temperature at which the surface of the particles became “melted” or — put another way — became “plastic” so that sticking of the particles to one another, or agglomeration, would occur. But even assuming that this is not the case, we are of the opinion that one using the Lewis process or appellants’ process (which we have said is not substantially different from Lewis’ process) would know exactly what to- do if defluidization took place. Throughout the prosecution *990 of this case, it seems to have been taken for granted that the defluidization takes place due to sintering of the particles so that agglomerates are formed which are larger than can be practicably fluidized. Indeed, the affidavit of Smith states specifically that at temperatures above the critical temperature, “sticking of the catalyst” takes place. If it is sintering or “sticking” together of the particles that causes the de-fluidization (and the skilled artisan would experience no difficulty in determining that the particles had sintered or stuck together), it is difficult to conclude other than that the operator of the process would be forced to the conclusion that, if fluidization is to be effected, the reducing temperature must be lowered. For it is only when the temperature is too high that sintering will take place. The only limitation on the lowering of the reduction temperature would be the reaction temperature of hydrogen and iron oxide. It would certainly not involve invention for one to experiment by reducing the temperature to such a point that defluidization would cease, with the reduction of iron oxide still taking place. In our opinion, this is all that appellants have done.
Claim 27 differs in substance from claim 25 only in that the iron oxide is recited as containing alkali and it is specifically stated that the particles “remain resident” in the reduction zone. As indicated in connection with claim 25, where we assumed that “pseudo-liquid dense phase” meant that there was no net movement of the particles (viz., that the particles “remained resident” in the reduction zone), there is no patentable significance to the latter limitation. As to the inclusion of alkali in the iron oxide, the most that can be said is that alkali might lower the maximum temperature of reduction. If such were the case, the situation would not differ materially from that in connection with claim 25. One skilled in the art would nonetheless experiment by lowering the temperature of reduction if defluidization took place.
Claim 28 depends from claim 27 and merely states that the process is carried out at a pressure below 100 psi. Lewis says nothing about the pressure used in his process and we assume that one following the Lewis teachings would work at atmospheric pressure or the like. No invention resides in this limitation.
Claim 33 differs from claim 25 in that it adds the limitation that the maximum reducing temperature is between 850° and 950° F., “the higher temperature within said range of 850° to 950° F. being used with iron oxide containing less than 0.8 weight per cent alkali and the lower temperature being used with iron oxide containing more than 0.8 weight per cent alkali.” As disclosed by appellants in their specification, the alkali reduces the incipient fusion temperature of the fluidized particles. While the limitations as to the presence of alkali *991 are more specific in this claim than in claim 27, the reasoning used with respect to that claim applies with equal force here. Eegardless of whether the skilled worker recognized that the alkali caused the de-fluidization at the lower temperature, he would nonetheless be spurred into experimenting with lower temperatures and would arrive at the results obtained by appellants.
Claim 35 differs from claim 25 in substance in the following particulars:
(1) the material to be treated is recited as “consisting principally of iron oxide” (emphasis added);
(2) said material contains less than 0.8 weight per cent alkali;
(3) there is substantially no net movement of the particles;
(4) the minimum temperature is 650° F.; and
(5) the quantity of reducing gas used is recited as at least 2 standard cubic feet per hour per pound of iron.
The second and third differences have already been treated in connection with our consideration of claims 33 and 27, respectively. The first distinction has no significance since Lewis specifically discloses the use of iron oxide and his process would obviously be as applicable where the ore used contained much or little of the oxide. The fourth distinction is without significance, as well (see our discussion of appellants’ third contention with respect to claim 25). The fifth difference is patently without patentable significance as it involves merely a matter of choice and proper coordination of the reaction conditions.
For the foregoing reasons, we agree with the board that the appellants’ claims are not patentable over Lewis. In light of our conclusion, it is unnecessary to review the board’s decision on the double patenting rejection.
It is necessary, however, to consider one additional matter. Before oral argument of this case, appellants filed a motion to strike portions of the brief for the Commissioner on the ground that they contained arguments relating to grounds of rejection and references not considered by either the board or the examiner. We deferred decision on this motion due to the fact that it would have required consideration of many of the same matters which would have had to be considered to reach a decision on the merits of the case. Since we have found it unnecessary to rely upon any of the matter to which the motion is directed, the questions presented by the motion are moot and do not require our consideration.
For the foregoing reasons, the decision of the Board of Appeals is affirmed.
Jackson, J., retired, recalled to participate, was present at the argument of this appeal, but did not participate in the decision.

 Two other references were relied upon by the board in Its rejection of claims 29 through 32. Appellants did not appeal from that rejection, however, and it is unnecessary, therefore, to discuss these references.

 This is the approximate Fahrenheit equivalent of the 700° C. figure suggested* by Lewis.